C. BREWER PUERTO RICO, INC., Defendant and Appellant, *v.* JUAN RODRÍGUEZ SANABRIA, Plaintiff and Appellee.

No. R-71-10.     Decided September 26, 1972.

*Ramón Cancio* for appellant. *Gutiérrez & Schmer* for appellee.

Mr. Justice Ramírez Bages delivered the opinion of the Court.

The payment of $50,675.04 for extra hours worked as timekeeper and second farm superintendent (*mayordomo*) in excess of eight hours per day, hours worked during the seventh day of each week, the time for coffee break and lunch, from January 1959 to July 1964, plus an equal sum for damages having been claimed, it was alleged as defense that during that period appellee was acting as one of appellant's executives.

On the grounds which we set forth hereinafter we conclude that appellee, in working during that period as second farm superintendent of a 600 cuerdas section of an appellant's sugarcane field, exercised duties of an executive.

The trial court concluded that during the time in which appellee performed the duties of timekeeper ". . . the evidence is not trustworthy, aside from the fact that it indicates that there was a claim for said concept and there was a payment."

*The period from December 1959 to 1964 during which appellee received a salary of $42 weekly up to January 1962, of $46 weekly up to December 1962, and of $200 monthly up to July 1964, remained pending.*

The remaining controversy is with respect to the fact whether during this period appellee performed duties as, and as a matter of fact was, an appellant's *executive*.

The trial court concluded, besides, that:

"Appellant worked as second farm superintendent at Colonia Mandry from December 22, 1960 to July 20, 1964. The evidence

does not establish that when defendant hired plaintiff in his new activity he was issued in writing what appears to be a pattern of conduct propitiating situations like the one involved in this case. The evidence establishes that the first farm superintendent was the officer empowered to fire or suspend workers, to settle or intervene in the solution of conflicts between the Colonia's workers and the Workers' Union. The second farm superintendent did not have those powers and as a matter of fact although it appears that the first farm superintendent exercised them during the period from 1960 to 1964; the second farm superintendent, the plaintiff herein, never exercised them. Not a single circumstance has been pointed out in which defendant would have acted in any of the aforesaid functional areas at the instance of the plaintiff herein. Neither does it appear that defendant had made known, through any affirmative act whatsoever, the executive powers of the plaintiff, in parity of situation and circumstances with the first farm superintendent to the workers of the Colonia. All these factual elements and others that arise from the evidence and which it is not necessary to point out, lead the Court to hold that plaintiff herein was not the executive or administrative employee to which the Revised Regulation No. 13 of the Minimum Wage Board refers.

. . . plaintiff's work in fact increased during the grinding seasons, being normal the remainder of the year. During the sugarcane cutting period the plaintiff had to get up very early to go and look for the laborers who worked in the cutting, taking them from their homes to the field and viceversa. These persons who used to cut the sugarcane lived close to or within the Colonia but he had to transport them in a jeep provided by defendant. It is to be noted, that the first farm superintendent does not appear to have performed such duty.

. . . besides the duties which he had to perform as second farm superintendent of the Colonia, he had to go and pick up workers for the cutting of the sugarcane in several places and to take them home. Plaintiff performed this work out of the hours and of the normal work as second farm superintendent.

"The court estimates that that work took him some five hours daily in excess of the regular working day of 8 hours.

"The court, as it has been said, does not have sufficient reliable evidence to determine whether plaintiff worked on Sundays and how much, if he actually worked.

"As a matter of fact, the court does not have reliable evidence in the sense that plaintiff worked during the lunch hour.

"As a question of law plaintiff is not entitled to be compensated for the so-called Coffee Break, if he worked it."

Relying on those conclusions the court rendered judgment ordering defendant to pay plaintiff $4,916 plus another equal sum for liquidated damages plus $500 of attorney's fees.

The parties agree that the Revised Regulation No. 13 of the Minimum Wage Board (29 R.&R.P.R. § 246e–8(2)(c)) is the legal provision applicable to this claim. In this Regulation the term *Executive* is defined as "Any employee who is engaged in agricultural activities in the production of sugarcane (as supervisor, foreman, or farm superintendent (mayordomo) in a cane field) who meets the requirements specified in subsections (1), (2), and (3) of paragraph (C), and who is compensated on a fixed basis (by day, week, fortnight or longer periods) equivalent to a weekly salary of not less than thirty dollars ($30)." Subsections (1), (2) and (3) of paragraph (C) provided the following:

"(1) who as farm superintendent [foreman, supervisor] is totally or partially in charge of supervising the farm;

"(2) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given special attention;

"(3) who customarily and regularly exercises discretionary powers;"

There is no doubt that appellee complies with the salary requirement of an executive, inasmuch as he always earned during the period in question more than the $30 weekly fixed by the said Regulation at that time.

We said in *People* v. *Luciano*, 83 P.R.R. 551, 559, 561 (1961), upon reversing a conviction for a violation of the "Bolita Act," that:

". . . Time and again we have held that the weighing of evidence made by the trial judge should be respected and upheld. We have only departed from this rule in cases of 'manifest error' in the exercise of such function, whenever a detailed examination of the entire evidence convinces us that the trier unjustifiedly discarded important probative elements or founded his criterion on worthless, or inherently improbable or incredible testimony.

". . . We judges should not, after all, be so naive as to believe statements which no one else would believe."

Likewise in *Román Montalvo* v. *Delgado Herrera*, 89 P.R.R. 419, 427 (1963), in consonance with the foregoing rule, we reversed a judgment in favor of an injured person, in a case for damages because the version of the facts which was believed by the trial judge was by all means discredited. We said in this case ". . . It is rather a question of sufficiency of evidence, of its quality, than of appreciation."

In *People* v. *Serrano Nieves*, 93 P.R.R. 55 (1966), a majority of this Court reversed a conviction for the offense of possessing heroin because ". . . the content of the evidence introduced raises reasonable doubt as to defendant's liability." See also, *People* v. *Ortiz*, 86 P.R.R. 431, 443 (1962) ; *People* v. *Ramos*, 43 P.R.R. 68, 69 (1932), in which we said ". . . we can, as an appellate court, determine whether there was manifest error in the weighing of the evidence." In the cases of *People* v. *Vázquez*, 33 P.R.R. 188 (1924) ; *People* v. *Rivera*, 25 P.R.R. 757 (1917) ; *People* v. *Ortiz*, 22 P.R.R. 630 (1915) ; *People* v. *Cofresí et al.*, 22 P.R.R. 696 (1915) ; and *People* v. *Vega*, 15 P.R.R. 317, 330 (1909), we reversed the convictions for insufficiency of the evidence in all of them. See also, *People* v. *Ayala Ortiz*, 97 P.R.R. 163 (1969).

In the case at bar, we must consider the evidence presented in the light of the rules which we have just set forth for the

purpose of determining whether plaintiff performed his work within the requirements set forth in the aforementioned regulation.

The evidence shows that appellee worked at defendant's Colonia Mandry which was in charge of a farm superintendent. This farm consisted of two sections, each one under a second farm superintendent. Plaintiff was in charge of the larger section of 600 cuerdas.

According to Mr. Pedro Pérez Nieves, the farm superintendent of the Colonia Mandry, who at the time of testifying at the trial held on February 24, 1970, did not work for appellant since September 1967, appellee, as second farm superintendent in charge of the 600 cuerdas section of Colonia Mandry, performed the following duties:

1. Interfered in appointing the 5 or 6 foremen employed during the grinding season, each one of whom had from 15 to 20 workers;

2. He organized and supervised the cutting of the cane, the hauling and the cultivation providing the necessary "people" for these jobs; "he removed the workers from one place to another if for any reason it was not convenient for them"; sometimes he would consult about this with the witness, sometimes he did so on his own;

3. He selected, disciplined, and fired the workers without consulting with the farm superintendent;

4. During the dead season he organized and distributed the work and "watched over the cultivation, the planting, the cutting of the seedlings . . . he did not have to consult me"; and he chose the foremen and the workers. To those effects and during the grinding season he used a defendant's jeep to move from one place to the other.

5. He prepared a weekly budget of his section's expenses and submitted it to the witness, he included harvest and farming expenses including those of the farm superintendent

and of the second superintendent. If the money was not enough to perform his work it was appellee's responsibility to postpone it until the next week.

6. He attended to emergency works such as repairs of doors and fences. For this purpose he looked for the necessary personnel.

7. Since appellee did not have a fixed schedule he himself noted down his entrance and departure from work; he worked from 5:30 a.m. up to 6:00 p.m. The regular workers did have fixed hours.

8. He took an hour more or less to lunch at his home, housing which was provided by the employer.

9. When he was absent from his work because of illness no deduction was made. He was allowed two weeks vacation annually; foremen and workers were not.

Said farm superintendent testified, besides, that he used to go on rounds by the sections "to see how were matters related to the work" and he supervised the works and "indicated to them the best manner to work"; gave orders to the second farm superintendents and the latter "complied . . . with the orders which I gave to them with the foremen"; that he (appellee) consulted with the witness, "if he suddenly met me"; that "I watched the work which he performed and he saw to it that the work was well done"; that he himself as well as the appellee took time out to drink coffee at about 8:00 or 9:00 each morning in each other's residence; not thus the workers; that the witness and appellee would see each other 10 or 12 times daily in the field. Then he said that he saw him 4 or 5 times daily in his section. He saw the two second farm superintendents drinking coffee and having lunch because "I was compelled to go by their homes every day"; that appellee gave orders to the foremen as to the work to be performed; that the witness fixed the hour to start and finish work; that if the witness noticed something that had not been properly

done he would tell them "correct that, it is not properly done"; that "if by chance a worker was useless, he [appellee] gave orders to suspend him" but he did not remember the name of any worker or foreman thus suspended, on account of the years that had elapsed; that the witness examined the budgets submitted by the second farm superintendents, he had them corrected if he found anything wrong, he signed and sent them to the central office; he mentioned the names of two foremen that had been chosen by appellee; that when the timekeepers were eliminated, the foreman made some lists in which they recorded the time worked by each worker whose name appeared printed in the lists, the foreman signed these lists and the farm superintendent picked them up and took them to the central office; that when the witness and appellee were in different places of the section, each one would give direct orders regarding the work at the place where they found themselves; that appellee did not work on Sundays.

The evidence presented by appellee is so partialized, and inherently improbable and incredible, that it does not deserve credit.

Appellee testified that his job as second farm superintendent consisted in "seeing the first farm superintendent, who was the executive, to pick up the orders for the day and obey them. These orders included the personnel to be used on the next day and the work to be performed." He testified that "my duties were, I would say, that of messenger of the first farm superintendent," that I could not look for workers on my own "because I did not dare. If I got to do it some day, my God!," that the first farm superintendent chose the workers; that the witness never selected either workers or foremen; that the first farm superintendent "ordered them to work and I took care of anything which they decided but ordered by him"; that "if anyone had to be fired it had to be taken up with the first farm superintendent"; that he started work at four in

the morning when he went "first to pick up the people. In a jeep assigned for the work . . ."; that the names of these workers were given to him by the farm superintendent; that then he would make the rounds along the lanes "supervising the farming, it means seeing if anything in connection with the farming was lacking in order to notify the farm superintendent over there. . ."; that he went to get the breakfast for the hauling and crane workers at the nearby stores and took it "To the sugarcane field to give it to the workers," that he asked for orders from the farm superintendent about using or not using the *"zancú";* that he passed down the orders given by the farm superintendent; that "After breakfast he had to go and bring the luncheons . . . at ten thirty. To the different places"; that for that purpose he made 3 or 4 trips; that, besides, under orders of higher chiefs he went "to get water in a pail in the same jeep . . . . For the workers"; that "the workers he brought in the morning he had to take them back to where he had picked them up . . . and brought new ones for the second shift"; that at 10:00 at night he took the workers "to their own homes where I had picked them up in the afternoon . . . during the grinding season" so that the witness would regularly return to his home from 11 to 12 at night and he got up at 4 and a half at dawn to start the work for the next day; that he was not allowed vacations; that he worked seven days a week since on Sundays he prepared "the payrolls" that at the Central appeared signed by him; that he did not take a coffee break since "I did not know what that was, there was no time for that"; that during the grinding season ". . . in ten minutes he had to lunch and keep on going"; that "the farm superintendent was the all around; in other words was the highest ranking"; that his job in the budget preparation consisted in passing to the budget "which was a larger book" the notes on any piece of paper which the farm superintendent would give him "because it was the farm superintendent who ordered everything to be done . . . .

Based on the numbers which he kept in his notebook. . ."; that if any foreman was fired, the farm superintendent did it; that the one who called the attention as to any matter regarding the work was the farm superintendent; that "At the end of 1962 and the beginning of 1963 the timekeepers were eliminated, then they gave us orders that we were second farm superintendents, to get the people, and prepare the lists, and prepare the payrolls, and to do everything that the timekeeper did"; that the payrolls were prepared in IBM machines; that from the notes of the foremen in their notebooks, the witness passed the information to large handwritten lists and these were delivered to the office. Upon being asked if the names of the workers did not come in some printed lists and that if anyone was absent his name was crossed out, and if there was a new one he was added to the list, he answered: "confound it!, I am going to be sincere with you: I do not know if the list came, the truth is that we had to deal with that matter . . . I do not remember about that." He did not remember if the said lists existed, if they were picked up daily; that "if there was any we picked it up weekly."

The Union's delegate and operator of a hauling vehicle known as "*zancú*" at Colonia Mandry testified that appellee worked there as an employee; that the farm superintendent Pedro Pérez supervised the witness' work, never the appellee; that he used to see appellee in a jeep; "At certain times he was carrying people, at other times he carried luncheons, other times the jeep passed empty"; that when he tried to communicate with appellee or when the "*zancú*" broke down ". . . he looked for him [Pedro Pérez] because he [appellee] used to tell me that he [Pérez] was the farm superintendent there . . . with whom I had to talk there, either concerning matters of the Union or matters . . . of the job, it was with him [Pérez]"; that the one who punished him with a week of suspension was Pérez who supervised the cutting and transportation at Colonia Mandry; that when workers were

suspended, the witness, as the Union's delegate, first handled the matter "with the foreman that was there, who has to do with that function, and afterwards, if the problem could not be settled between the foreman and myself . . . then I looked for Pedro Pérez . . ."; that appellee would tell him "that he did not have authority to deal with those matters"; that he assumed that appellee was Pérez' assistant, that he did not know that there was a second farm superintendent; that he saw appellee "I used to see him all around the place. . . I met him on two or three occasions around there . . . he talked to the workers and to the foremen . . . I did not pay attention to what they talked .. . . first I thought that he was an employee who could help me in something . . . because I saw him riding in the jeep around there"; that he did not know that appellee was second farm superintendent, nor that he lived at the employer's house although he knew that he lived on the latter's land.

Flor Díaz Medina, the one in charge of the employer's railway station in Naguabo, testified that he knew appellee when the latter went to work as timekeeper or messenger . . at Colonia Mandry. . ."; that he saw him "distributing people" in the morning and then in the afternoon and "distributing luncheons . . . . Taking workers to their homes . . . during . . . the grinding season . . ., that he used the jeep to transport the workers, take them to their homes"; that appellee "was a timekeeper; I would rather say a messenger, because what he did was to carry papers and transport people"; that appellee himself and Pedro Pérez told him that appellee was a timekeeper for which reason he was not empowered to give permissions or take measures for anything for that corresponded to the farm superintendent Pedro Pérez; that "Because I saw that man [appellee] handling bags and handling people and that is why I say that he was a messenger of the company."

In rebuttal farm superintendent Pedro Pérez Nieves testified again to explain how the workers, the luncheons, and

the water were transported at Colonia Mandry. He testified that "there were trucks specifically to get the workers; if any workers were missing, he [appellee] would bring them in his car . . . in the jeep . . . . There was Diego Molina who was the driver who brought the people for the hauling . . ."; that there was a truck for the hauling and two others driven by Luciano Lozada and Faustino Serrano; that "If any worker was absent he [appellee] brought from the field a skilled worker . . . if there was a worker on the way he would carry him. In each brigade there was a luncheon man" and a waterman; that "The same one who brought the hauler's would also bring the crane's"; that the employer paid $20 daily to Diego Molina for bringing and taking back the laborers, and $19 daily to Lozada and the same amount to Serrano; that "full daily wage was paid to a man for that, for bringing the luncheons" and to a waterman for carrying the water; that there was a luncheon man for the cutting and another for the hauling who went to get the luncheons; that there were "vendors" whom the employer permitted to come and sell "coffee, refreshments, and fries and whatever they wanted." He denied having said that he was the one who gave orders at Colonia Mandry and that appellee did not give orders there inasmuch as "he [appellee] had many attributions to give orders, and supervise, and give orders there." On cross-examination he explained that the Colonia employed an average of 150 to 200 men; that the three trucks transported 40 men each plus 25 or 30 who lived "close by, near there in the *batey*"; that appellee "was empowered to look for workers if he needed them . . . . He was not authorized to go and get the luncheons."

■ The foregoing summary of the evidence, shows that the findings of the trial judge concerning appellee's duties are not justified since they are grounded on testimonies inherently incredible. On the contrary, the evidence clearly shows that:

(a) Appellee was entrusted with the partial supervision of a 600 cuerdas section of a sugarcane plantation.

(b) That he was authorized to employ, discipline and fire the workers.

(c) He organized and supervised the cutting, hauling and cultivation of the cane. To those effects he had intervention in appointing the foremen, provided the workers for each job, he transferred workers from one job to another according to needs, and he prepared the weekly budget. As attributions as an executive of the employer, he did not have fixed hours of work, he lived in a house of the employer, and had a right to vacations, privileges not extended to the workers. *Marcano Rodríguez* v. *Pepsi Cola Bot. Co.*, 95 P.R.R. 433 (1967).

The lack of credibility of appellee's evidence arises from the exaggeration with which it was sought to diminish the nature of appellee's duties. The testimony that he was only a timekeeper is not credible inasmuch as during the period of the claim the employer had abolished that position and the payroll work was performed at the central office on the basis of some lists which were prepared by the foremen, delivered to appellee, and were carried by the latter to the office. The same occurs with the testimony that he was a mere messenger for bringing and carrying back the workers and the luncheons since this could not be performed in only one jeep when 150 workers were involved. It seems obvious that these duties had to be performed by other persons using large trucks, persons to whom witness Pérez Nieves made specific reference by their names.

It is to be noted also that the testimony of Pérez Nieves, who had ceased to work for the appellant employer for some three years before testifying, could be considered more trustworthy than that of the proper appellee, the union's representative, and the other fellow worker, who inexplicably declared that they did not know with certainty which were appellee's duties besides working as timekeeper and messen-

ger, duties which clearly he did not exercise except insofar as taking the lists prepared by the foremen to the central office.

For the grounds stated, the judgment rendered in this case by the Superior Court, Caguas Part, should be reversed and another rendered dismissing the complaint.

Mr. Justice Hernández Matos took no part in the decision of this case.

Mr. Justice Dávila dissented in a separate opinion in which Mr. Justice Torres Rigual and Mr. Justice Martín concur.

—O—

MR. JUSTICE DÁVILA, with whom MR. JUSTICE TORRES RIGUAL and MR. JUSTICE MARTÍN concur, dissenting.

San Juan, Puerto Rico, September 26, 1972

The Court, through the opinion rendered today, sets aside a judgment rendered by the Superior Court, Caguas Part, that orders appellant C. Brewer Puerto Rico, Inc., to pay to a worker the amount of $4,916 plus an equal sum as penalty and $500 for attorney's fees. I dissent because Rule 43.1 of the Rules of Civil Procedure of 1958 is clear and final upon providing that ". . . Findings of fact based on oral evidence shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. . . ." The opinion of the Court ignores the provision of the Rule which the Court itself adopted, and weighs the evidence as if it were judging the case at first instance. The principal function of this Court is to determine if the determinations of the trial court have sufficient support on the evidence presented, and in the absence of passion, prejudice or partiality they should be accepted. It is evident that the findings of fact which are now set aside have sufficient grounds on the evidence. I cannot concur.